***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. NCME Fund through Isurity Insurance Services was the carrier on the risk.
3. An employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff-employee (hereinafter "decedent") sustained an admittedly compensable injury by accident arising out of and in the course of the employment with defendant-employer on June 21, 2002, resulting in a fractured left leg. Pursuant to Forms 63 and 60, defendants paid decedent temporary total disability benefits beginning June 21, 2002, at the rate of $311.15 per week.
5. Decedent's average weekly wage was $466.69, yielding a maximum weekly compensation rate of $311.15.
6. The parties stipulated 214 pages of medical records into evidence.
7. The issues before the Deputy Commissioner were what medical treatment decedent was entitled to receive and whether decedent should have been compelled to comply with medical treatment and vocational rehabilitation.
8. The issue before the Full Commission is what medical treatment decedent was entitled to receive. Because of decedent's death, issues related to decedent's compliance with cessation of smoking and vocational rehabilitation are now moot.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, decedent was a 46-year-old fifth-grade educated male. Decedent had a significant history of hypertension, which required two anti-hypertensives for treatment. Decedent smoked two packs of cigarettes per day.
2. On June 21, 2002, decedent and his brother-in-law were working for defendant-employer burying underground cable when they ran into a beehive. Decedent's brother-in-law was operating a tractor and accidentally put the tractor in reverse, running over decedent's left leg. The tractor then began to move forward, running over decedent's leg a second time. Following the incident, decedent was taken by ambulance to North Carolina Baptist Hospital in Winston-Salem. Orthopedist Dr. David Ruch initially treated decedent for fractures to the left tibia and fibula. Dr. Ruch performed an initial external fixation surgery.
3. In July 2002, Dr. Ruch recommended a bone stimulator for decedent. In August 2002, Dr. Ruch found decedent to have a persistent non-union of the tibia. Dr. Ruch discussed possible treatments, including an intermedullary nail or a bone graft. He subsequently referred decedent to orthopedist Dr. Robert D. Teasdall, a specialist in the treatment of the lower extremities. Dr. Ruch last saw decedent on December 20, 2002.
4. On September 20, 2002, Dr. Teasdall saw decedent, recommending removal of the external fixator and placing decedent's left leg in a long cast. Decedent reported pain in the lateral aspect of his ankle when he turned his leg inward. On October 2, 2002, Dr. Teasdall removed the external fixator and placed decedent in a long leg cast. On October 18, 2002, Dr. Teasdall removed decedent's cast to evaluate the progress and found the pin sites healing. Dr. Teasdall ordered decedent to be recasted. In November 2002, Dr. Teasdall recommended intermedullary nailing to try to get the bone to heal. Defendant-carrier referred decedent to Dr. Stephen Sims at Miller Orthopaedic Clinic for a second opinion.
5. On November 27, 2002, Dr. Sims saw decedent and recommended decedent have the screw and plate fixation procedure first, and only proceed with intermedullary nailing if the first procedure was unsuccessful.
6. On February 7, 2003, decedent returned to Dr. Teasdall and informed him that he wanted to proceed with the treatment Dr. Teasdall recommended, intermedullary nailing. Dr. Teasdall ordered decedent be placed on a fracture boot, pending authorization of the additional surgery by defendant-carrier. On March 19, 2003, Dr. Teasdall performed the procedure to place the intermedullary nail in the tibia and also discussed decedent's cessation of smoking to expedite the healing process. In July 2003, Dr. Teasdall reviewed an x-ray of the tibia after the procedure, which revealed that the bone was not healing.
7. Dr. Teasdall recommended additional treatment for decedent's nonunion of the left tibia, including an iliac crest graft. Dr. Teasdall indicated, however, that because decedent's leg failed to heal, he was unwilling to perform the procedure until decedent stopped smoking.
8. Defendants paid for medical treatment and medication to aid decedent to stop smoking. Decedent was able to reduce his smoking from two packs to a few cigarettes per day, but was not able to quit smoking entirely.
9. On February 3, 2004, Dr. Teasdall last saw decedent. Dr. Teasdall found decedent physically capable of attending G.E.D. classes and informed decedent that he would not undertake additional surgery unless decedent stopped smoking. Dr. Teasdall further informed decedent that smoking inhibits bone healing.
10. After the injury and while he was enrolled in the G.E.D. course provided by defendants, decedent began to have panic attacks, cold sweats and nightmares of the tractor running over his leg. Decedent sought treatment from Dr. Adrian Griffin, psychiatrist. Decedent previously saw Dr. Griffin in February 2001 for depression related to his wife's death. When he saw decedent on April 30, 2004, Dr. Griffin diagnosed post-traumatic stress disorder. Dr. Griffin felt decedent's "physical ailments exacerbated the stress-related illnesses he had," including decedent's high blood pressure. Dr. Griffin prescribed medication to lower decedent's blood pressure because he felt decedent was at risk for heart attack or stroke. Dr. Griffin also felt it was futile for decedent to continue the G.E.D. course and removed him from the program. Dr. Griffin testified that the G.E.D. course caused plaintiff to become bright red in the face while sitting in class; he was aggravated, embarrassed, not able to function, had panic attacks, was paralyzed by indecision and did not perform well. Dr. Griffin stated, "from a pure psychiatric perspective, [decedent] would probably meet [Social Security] disability criteria irrespective of his leg or his hypertension." The Full Commission finds that Dr. Griffin's treatment of decedent for psychological conditions was causally related to the June 21, 2002 injury by accident.
11. Prior to June 21, 2002, decedent received treatment from Dr. Greenwood at Baptist Hospital for high blood pressure. Decedent contended that his existing hypertension was aggravated by his leg injury and the stress of going to G.E.D. classes. Dr. Teasdall, Dr. Griffin, and Cynthia Felix, decedent's rehabilitation nurse, testified that pain could cause an elevation in blood pressure. The Full Commission finds that while decedent did have a history of hypertension prior to June 21, 2002, decedent's pain and stress from the injury exacerbated his hypertension and therefore the treatment of decedent's hypertension after June 21, 2002 is causally related to his compensable injury by accident.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Decedent sustained an admittedly compensable injury by accident arising out of and in the course of the employment on or about June 21, 2002. N.C. Gen. Stat. § 97-2(6).
2. As the result of the compensable injury by accident, decedent was totally disabled and was entitled to temporary total disability compensation at the rate of $311.15 per week beginning June 21, 2002 until his death on April 2, 2005. N.C. Gen. Stat. § 97-29. This compensation has been paid by defendants.
3. Plaintiff is entitled to have defendants pay for medical expenses incurred by decedent as a result of the compensable injury as were required to provide relief, effect a cure or lessen the period of disability, including psychiatric treatment and medications provided by Dr. Griffin, and for treatment of decedent's hypertension. N.C. Gen. Stat. §§ 97-2(19),97-25, and 97-25.1.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay for medical expenses incurred as a result of decedent's compensable injury, including psychiatric treatment and medications provided by Dr. Griffin, and for treatment of decedent's hypertension.
2. Defendants shall pay the costs, including expert witness fees of $400.00 to Dr. Robert D. Teasdall and $300.00 to Dr. Adrian Griffin.
This 29th day of July 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER